IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

| | |
|---|---|
| MARY E. GRIFFIN ) | |
| ) | |
| v. ) | No. 2:08-0106 |
| ) | Judge Nixon/Bryant |
| SOCIAL SECURITY ADMINISTRATION ) | |

To:     The Honorable John T. Nixon, Senior Judge

## REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. § 405(g), to obtain judicial review of the final decision of the Social Security Administration ("SSA" or "the Administration"), through its Commissioner, denying plaintiff's application for disability insurance benefits ("DIB"), as provided under Title II of the Social Security Act ("the Act"). The case is currently pending on plaintiff's motion for judgment on the administrative record (Docket Entry No. 17), to which defendant has responded (Docket Entry No. 19). Upon consideration of these papers and the transcript of the administrative record (Docket Entry No. 13),[1] and for the reasons given below, the undersigned recommends that plaintiff's motion for judgment be DENIED, and that the decision of the SSA be AFFIRMED.

### I. Introduction

After first filing an application for DIB in 1995 and pursuing it through a

---

[1]Referenced hereinafter by page number(s) following the abbreviation "Tr."

1

denial at the reconsideration stage of review by the state Disability Determination Section ("DDS"), plaintiff again filed an application for DIB based upon back pain and nerves/depression on April 22, 1999, alleging the onset of disability as of February 1, 1995. (Tr. 109-11, 142) After denials at the initial and reconsideration stages of DDS review, plaintiff filed her request for *de novo* hearing before an Administrative Law Judge ("ALJ"). The matter was heard before the ALJ on May 23, 2003, and the decision that followed found plaintiff "not disabled" by virtue of the lack of any severe, medically determinable impairment (Tr. 66-70).

On December 5, 2005, the SSA's Appeals Council vacated the decision of the ALJ and remanded the matter for a new hearing and decision, in view of the ALJ's error in considering, *inter alia*, the evidence from plaintiff's treating physician, Dr. Melvin Blevins, M.D. (Tr. 71-73) On remand, the case was assigned to a new ALJ, who held a hearing on October 6, 2006 (Tr. 727-52). Plaintiff appeared with counsel, and testimony was received from both plaintiff and an impartial vocational expert. At the conclusion of the hearing the ALJ took the matter under advisement, until March 2, 2007, when he issued a written decision denying plaintiff's claim to disability benefits. (Tr. 21-32) The ALJ's decision contains the following enumerated findings:

1. The claimant last met the insured status requirements of the Social Security Act on June 30, 1996.

2. The claimant did not engage in substantial gainful activity during the period from her alleged onset date of February 1, 1995 through her date last insured of June 30, 1996 (20 CFR 404.1520(b) and 404.1571 *et seq.*).

3. Through the date last insured, the claimant had the following severe impairments: minimal degenerative arthritis in the lumbar spine, hypertension, reflux disease, obesity, and depression (20 CFR 404.1520(c)).

4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to lift and carry up to 25 pounds frequently and sit, stand, and walk for 6 to 8 hours each out of an 8 hour day. The claimant could not perform more than occasional climbing, balancing, kneeling, crouching, crawling, or stooping. The claimant had a slight (mild limitation, but generally functions well) limitation in her ability to understand and remember short, simple instructions. She had a moderate (moderately limited, but still able to function satisfactorily) limitation in her ability to carry out short, simple instructions; make judgments on simple, work-related decisions; respond appropriately to work pressures in a usual work setting; and respond appropriately to changes in a routine work setting. Finally, the claimant had marked (severely limited, but not precluded) limitations in her ability to understand, remember, and carry out detailed instructions.

6. Through the date last insured, the claimant was unable to perform past relevant work (20 CFR 404.1565).

7. The claimant was born on August 7, 1951 and was 44 years old, which is defined as a younger individual, on the date last insured (20 CFR 404.1563).

8. The claimant has a limited education and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568).

10. Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1560(c) and 404.1566).

11. The claimant was not under a disability as defined in the Social Security Act, at any time from February 1, 1995, the alleged onset date, through June 30,

1996, the date last insured (20 CFR 404.1520(g)).

(Tr. 23, 26, 27, 30, 31)

On September 19, 2008, the Appeals Council denied plaintiff's request for review of the ALJ's decision (Tr. 9-11), thereby rendering that decision the final decision of the Administration. This civil action was thereafter timely filed, and the court has jurisdiction. 42 U.S.C. § 405(g). If the ALJ's findings are supported by substantial evidence, based on the record as a whole, then those findings are conclusive. Id.

## II. Review of the Record

As revealed in the foregoing review of the procedural history of this case, for various reasons the conclusion of administrative proceedings on plaintiff's disability claim was nearly ten years in the making. Consequently, the period under review here is remote, since on this Title II claim for disability insurance benefits, plaintiff must establish her entitlement to benefits on or prior to her date last insured -- June 30, 1996.[2] The vast majority of the medical evidence in this case was generated long after the expiration of plaintiff's insured period, but was nevertheless reviewed by the ALJ and summarized by the parties here in their memoranda. The following summary focuses on the medical evidence that was generated prior to plaintiff's date last insured, and that is relevant to the issues she raises in this litigation.

On May 30, 1995, plaintiff presented with complaints of abdominal pain to Dr. Melvin Blevins, who took her history and physically examined her as a new patient. (Tr.

---

[2] See, e.g., Moon v. Sullivan, 923 F.2d 1175, 1182 (6th Cir. 1990).

4

372) This examination revealed diffuse tenderness in the epigastric area, but was otherwise normal. Plaintiff was diagnosed with anemia, peptic ulcer disease, and urinary tract infection, and was started on appropriate medications. An esophagogastroduodenoscopy (EGD) was scheduled. Id. The EGD results confirmed the presence of reflux esophagitis, or gastroesophageal reflux disease (GERD). (Tr. 475)

Upon referral from Dr. Blevins, plaintiff was seen in consultation by Dr. Denise Dingle in early 1995, for dysfunctional uterine bleeding. (Tr. 220). After failing conservative treatment of this condition with hormone therapy, plaintiff was recommended to undergo a total abdominal hysterectomy, with bilateral salpingo-oophorectomy. (Tr. 220, 241) Dr. Dingle performed this successful surgery without complication on June 1, 1995, and discharged plaintiff home on June 3, 1995. (Tr. 223-40) Dr. Dingle issued an assessment of plaintiff's ability to perform work-related tasks on June 15, 1995, though the assessment was qualified as reflecting only "postop restrictions" which Dr. Dingle expected to be lifted within a month (Tr. 245-46).

On July 11, 1995, Dr. Blevins made a report to DDS after being asked to perform a consultative examination of his patient, with specific instructions "to include the height, weight, and blood pressure, general appearance, description of gait and station and range of motion of the lumbar spine and the left leg." (Tr. 255-60) On the day of the examination, July 3, 1995, plaintiff gave the following history:

> The claimant states that most of her problems began relating to her back in 1987. She had been moving her household and therefore lifting heavy objects. She awoke one morning and states that she had no feeling from her waist down. She was hospitalized. The problem last for approximately three months. She did stay in the hospital one week and was taking physical therapy two to three days per week for approximately two months. She

5

> relates that during this time she did have total bladder function. Presently,
> she complains that she has fairly constant mid and low back pain. She also
> relates that both legs ache most of the time, worse on the right than the left.
> She reports no numbness in the legs. She has never had any back surgery.

(Tr. 255) On examination, Dr. Blevins found no abnormalities in plaintiff's gait, station, or range of motion of the lumbar spine or legs. (Tr. 256) He further found no abnormality on examination of her back, and noted that straight leg raise testing was negative, and that she had no muscular spasm. Id. Dr. Blevins noted only paralumbar tenderness and mildly diminished reflexes bilaterally. His final diagnostic impressions were musculoskeletal pain disorder, chronic lumbosacral strain, and obesity. Id. Dr. Blevins did not feel that these conditions produced any work-related physical limitations. (Tr. 257-58)

       One month later, on August 15, 1995, Dr. Blevins completed an assessment form without any narrative explanation, in which he opined that plaintiff was limited to occasionally lifting/carrying up to 25 pounds, standing/walking for a total of at least 2 out of 8 hours, and sitting for a total of about 6 out of 8 hours. Dr. Blevins indicated that he could not assess plaintiff's capacity for frequent lifting/carrying. (Tr. 374-75)

       On September 5, 1995, a nonexamining DDS medical consultant reviewed plaintiff's medical records and opined that her back disorder limited her to occasionally lifting/carrying 50 pounds, frequently lifting/carrying 25 pounds, and standing, walking, and sitting for 6 out of 8 hours each. (Tr. 267-74)

       In November of 2000, plaintiff developed weakness and numbness in her left leg, which prompted a neurological referral. (Tr. 394, 457, 463) These symptoms resolved over the next six weeks, though the discovery of a lesion on the thoracic spinal cord led to a diagnosis of spinal multiple sclerosis. (Tr. 463-64) However, in 2001, upon further testing

6

by Dr. Harold Moses at Vanderbilt University Medical Center, plaintiff was determined to not suffer from multiple sclerosis, but rather relapsing transverse myelitis (Tr. 384-90). In September 2001, Dr. Blevins diagnosed plaintiff with type II (non-insulin dependent) diabetes. (Tr. 355-57) Subsequent to these diagnoses and the course of treatment related to them, plaintiff's work-related abilities have been assessed by plaintiff's physicians on a number of occasions, with results indicating greater restrictions than were assessed during the period of her insurance for disability benefits, owing largely to her pain. (Tr. 323-25, 350-51, 380-82, 384-89, 417-419, 472-74, 639-42, 685-88)

On May 13, 2003, Dr. Blevins submitted an assessment of plaintiff's work-related abilities as they existed "from 1995 through June 1996" (Tr. 472-75). In this assessment, Dr. Blevins opined that plaintiff could lift/carry as much as 20 pounds occasionally, but less than 10 pounds frequently; could stand/walk at least 2 out of 8 hours; could sit about 6 out of 8 hours; had limited ability to push/pull in both the upper and lower extremities; would be required to periodically alternate between sitting and standing to relieve pain or discomfort; would often experience pain severe enough to interfere with attention and concentration; would sometimes need to take unscheduled work breaks; would be limited only occasional postural maneuvers; would be limited in reaching all directions and in fingering (fine manipulation); and, must avoid even moderate exposure to all environmental hazards, irritants, temperature extremes, etc. Id.

On May 24, 2006, a consultative examiner, Dr. Surber, opined that based on his examination of plaintiff that day, as well as his review of her medical records from 1995 and 1996, she would be capable of frequently lifting at least 10 to 25 pounds, and would be capable of standing/walking/sitting for up to 6 out of 8 hours each. (Tr. 651-58)

7

## III. Conclusions of Law

### A. Standard of Review

This court reviews the final decision of the SSA to determine whether that agency's findings of fact are supported by substantial evidence in the record and whether the correct legal standards were applied. Elam ex rel. Golay v. Comm'r of Soc. Sec., 348 F.3d 124, 125 (6th Cir. 2003). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Rogers v. Comm'r of Soc. Sec., 486 F.3d 234, 241 (6th Cir. 2007)(quoting Cutlip v. Sec'y of Health & Human Servs., 25 F.3d 284, 286 (6th Cir. 1994)). Even if the evidence could also support a different conclusion, the SSA's decision must stand if substantial evidence supports the conclusion reached. Her v. Comm'r of Soc. Sec., 203 F.3d 388, 389 (6th Cir. 1999).

### B. Proceedings at the Administrative Level

The claimant has the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant's "physical or mental impairment" must "result[] from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." Id. at § 423(d)(3). In proceedings before the SSA, the claimant's case is considered under a five-step sequential evaluation process, described by the Sixth Circuit Court of Appeals as follows:

8

1) A claimant who is engaging in substantial gainful activity will not be found to be disabled regardless of medical findings.

2) A claimant who does not have a severe impairment will not be found to be disabled.

3) A finding of disability will be made without consideration of vocational factors, if a claimant is not working and is suffering from a severe impairment which meets the duration requirement and which meets or equals a listed impairment in Appendix 1 to Subpart P of the Regulations. Claimants with lesser impairments proceed to step four.

4) A claimant who can perform work that he has done in the past will not be found to be disabled.

5) If a claimant cannot perform his past work, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed.

Cruse v. Comm'r of Soc. Sec., 502 F.3d 532, 539 (6th Cir. 2007)(citing, e.g., Combs v. Comm'r of Soc. Sec., 459 F.3d 640, 642-43 (6th Cir. 2006)(en banc)); 20 C.F.R. §§ 404.1520(b)-(f), 416.920 (b)-(f).

The SSA's burden at the fifth step of the evaluation process can be carried by relying on the medical-vocational guidelines, otherwise known as "the grids," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. See Wright v. Massanari, 321 F.3d 611, 615-16 (6th Cir. 2003). Otherwise, the grids cannot be used to direct a conclusion, but only as a guide to the disability determination. Id.; see also Moon v. Sullivan, 923 F.2d 1175, 1181 (6th Cir. 1990). In such cases where the grids do not direct a conclusion as to the claimant's disability, the SSA must rebut the claimant's *prima facie* case by coming forward with proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert ("VE")

9

testimony. See Wright, 321 F.3d at 616 (quoting Soc. Sec. Rul. 83-12, 1983 WL 31253, *4 (S.S.A.)); see also Varley v. Sec'y of Health & Human Servs., 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity ("RFC") for purposes of the analysis required at steps four and five above, the SSA is required to consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and nonsevere. See 42 U.S.C. §§ 423(d)(2)(B), (5)(B); Foster v. Bowen, 853 F.2d 483, 490 (6th Cir. 1988).

### C. Plaintiff's Statement of Errors

Plaintiff's sole contention in this case is that the ALJ erred in rejecting the opinions of her treating physicians, Drs. Blevins and Moses. Plaintiff takes issue with the ALJ's reasoning in declining to give controlling weight to these physicians' opinions, and with his failure to adequately explain the decision to give them no weight at all.

As previously mentioned, and as amply referenced in the ALJ's enumerated findings and narrative decision, the issue in this case is whether plaintiff's disability is established on or before June 30, 1996, her date last insured. The vast majority of the evidence of plaintiff's treatment with Dr. Blevins, and all of the evidence of her treatment with Dr. Moses, postdates June 30, 1996. "Evidence of disability obtained after the expiration of insured status is generally of little probative value." Strong v. Soc. Sec. Admn., 88 Fed.Appx. 841, 846 (6th Cir. Feb. 3, 2004). See also Key v. Callahan, 109 F.3d 270, 273-74 (6th Cir. 1997) ("Although arguably Dr. Weatherford's testimony and records would support a conclusion that claimant is disabled as of today, they will not support a finding that he was disabled as of the date of the expiration of his insured status on December 31, 1988. ... The

10

only necessary inquiry is whether the claimant was disabled prior to the expiration of his insured status...."). "In fact, record medical evidence from after a claimant's date last insured is only relevant to a disability determination where the evidence 'relates back' to the claimant's limitations prior to the date last insured." Lancaster v. Astrue, 2009 WL 1851407, at *11 (M.D. Tenn. June 29, 2009) (quoting Higgs v. Bowen, 880 F.2d 860, 863 (6th Cir. 1988)).

Consistent with this standard, the ALJ "considered the vast amount of medical evidence generated subsequent to the expiration of the claimant's insured status in June 1996 to determine if any of said evidence could relate back to the period before said expiration" (Tr. 29), and ultimately determined that it did not. In so doing, the ALJ entirely rejected the October 2001 and July 2002 functional assessments rendered by Dr. Moses, due to the fact that they were inconsistent with the negative diagnostic testing for multiple sclerosis and the conservative treatment administered for plaintiff's complaints of pain. (Tr. 29) Plaintiff argues that the ALJ erroneously interpreted Dr. Moses's functional evaluations as based on an unsupported diagnosis of multiple sclerosis, when in fact they were based on the diagnosis of transverse myelitis and related lower back pain, as supported by the evoked potential test results confirming spinal cord dysfunction (Tr. 390). However, even if the ALJ did mistakenly view the objective test results and their significance to the diagnosis and opinions of Dr. Moses, it is clear that any such error is harmless given the irrelevance of Dr. Moses's treatment and opinions to the time period at issue in this case. Indeed, Dr. Moses did not begin treating plaintiff until March of 2001, nearly five years after plaintiff's date last insured, and specifically noted that his opinions were related to neurological symptoms which did not arise until November of 2000, when plaintiff noticed that her left leg was

11

numb. (Tr. 386, 394) Accordingly, as was the case in <u>Lancaster</u> (where the treating physician's diagnosis and assessments were not even mentioned in the administrative decision), "the ALJ did not err in failing to accord any weight to [the treating physician's] opinion and diagnosis, since they did not relate back to the relevant time period and therefore are completely irrelevant to a determination of disability prior to the [date last insured]." 2009 WL 1851407, at *12.

Likewise, the functional assessments rendered by Dr. Blevins in September 2001 (Tr. 350-51), May 2002 (Tr. 323-25), March 2003 (Tr. 417-19), April 2006 (Tr. 639-42), and September 2006 (Tr. 685-88), are plainly directed to plaintiff's work-related abilities on those dates, rather than 5-10 years prior to their rendering,[3] and are thus irrelevant to the disability determination. However, there are two functional assessments which are clearly relevant to the period under review here, and are thus potentially subject to the requirements of 20 C.F.R. § 404.1527(d)(2), pertaining to the evaluation of treating source opinions. In particular, that regulation requires that when the treating source's opinion is not entitled to controlling weight, the ALJ must "always give good reasons" for the reduced weight assigned to the opinion. <u>Id.</u> This procedural requirement confers a "substantial right" upon claimants whose treating source has been discounted. <u>Wilson v. Comm'r of Soc. Sec.</u>, 378 F.3d 541, 546-47 (6th Cir. 2004). As detailed below, the ALJ made the substantially supported finding that Dr. Blevins's assessments as plaintiff's treating physician are lacking in

---

[3] While the March 2003 assessment is labeled an "assessment of condition from 1995 through 1998" (Tr. 417), it appears that Dr. Blevins failed to appreciate the form's instructions to evaluate "what the individual could do between 1995 and 1998," as the limitations assessed therein are not consistent with the other two assessments based on his treatment of plaintiff's condition during that period.

12

objective, clinical support and are inconsistent with his earlier findings as a consultant, and it is thus clear that he did not err in discounting the evidentiary weight of these relevant opinions.[4]

The medical opinions relevant to plaintiff's period of insurance include one rendered contemporaneously by Dr. Blevins on August 15, 2005 (Tr. 374-75), and one rendered retrospectively on May 13, 2003, after Dr. Blevins had reviewed his treatment notes from the relevant time frame (Tr. 475) and focused his opinion on plaintiff's condition "from 1995 through June 1996" (Tr. 472-74). While it does not appear that the ALJ recognized the May 2003 assessment as purporting to relate back to plaintiff's insured period, his analysis of that assessment does not suffer for it, as all Dr. Blevins's assessments were analyzed against the objective medical record during the relevant time, to wit:

> Notably, Dr. Blevins, who consultatively examined the claimant in July 1995 and then became her family physician, opined that she had no evidence of any impairment-related physical limitations. The undersigned assigns no weight to the subsequent functional assessment of Dr. Blevins in August 1995 and the numerous subsequent assessments from June 2001 through September 2006

---

[4] Although the issue was not raised by the ALJ, nor by defendant in its brief to this court, the undersigned would submit that, at least at the time of Dr. Blevins's August 1995 assessment, he did not qualify as plaintiff's treating physician, inasmuch as the doctor-patient relationship had only been ongoing for less than three months, and the evidence of record shows their interaction to that point to have included only an initial, new-patient examination in May 1995, a brief consultative examination in July 1995, and one followup visit in July 1995. Between the August 1995 assessment and the end of plaintiff's insured period in June 1996, there is no evidence of any visit to Dr. Blevins. Such a limited record of treatment during the insured period would not appear sufficient to confer treating physician status upon Dr. Blevins. See 20 C.F.R. § 404.1502 (defining "treating source" as one which "the medical evidence establishes that you see, or have seen, ... with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for your medical condition(s)"); Kornecky v. Comm'r of Soc. Sec., 167 Fed.Appx. 496, 506-07 (6th Cir. Feb. 9, 2006) ("The question is whether Lian had the ongoing relationship with Kornecky to qualify as a treating physician *at the time he rendered his opinion*.") (emphasis in original).

13

> which assign significant restrictions and limit the claimant to semi-sedentary activity. Said assessments are unsupported by the objective evidence of record, the claimant's benign clinical exams, and her conservative treatment. They (especially his August 1995 assessment that the claimant was limited to sedentary activity) are also markedly inconsistent with Dr. Blevins' own July 1995 opinion that the claimant had no physical limitations at all.

(Tr. 28-29) The ALJ had previously observed that "[t]he record provides no evidence of any intervening events, diagnostic tests, or other clinical developments to warrant this change in his opinion" between July and August 1995. (Tr. 24)

Plaintiff argues that the ALJ placed too much stock in the consultative report of Dr. Blevins in July 1995, since that report "was based upon a brief examination focusing on gait and station and range of motion whereas, once he became her treating physician, he became more fully acquainted with all of Ms. Griffin's conditions." (Docket Entry No. 18 at 9) However, Dr. Blevins began treating plaintiff in May 2005 (Tr. 372), prior to his consultative examination of her, and the results of that May 2005 examination are consistent with his later consultation, to the extent that straight leg raise testing was negative and deep tendon reflexes were normal. Moreover, while Dr. Blevins's consultative report does reflect the narrow focus of his examination (Tr. 255), the parameters for that examination were based upon plaintiff's allegations of back pain, which is presumably also the basis for the limitations assessed by Dr. Blevins a month later (Tr. 374-75), though the assessment form itself offers no clues as to the medical causes of the limitations assessed. In any event, the ALJ rightly observed that the record of plaintiff's treatment with Dr. Blevins does not reveal any objective support for the limitations he later assessed, either during the period leading up to the July 2005 consultative examination (Tr. 372), the period between that examination

14

and the submission of the August 15, 2005 assessment, or thereafter.[5] In fact, the record contains no evidence whatsoever of plaintiff's treatment with Dr. Blevins between his July 3, 1995 consultative examination of her and the expiration of her insured period, save for one largely illegible treatment note dated July 31, 1995, which appears to document a checkup related to the abdominal problems she was experiencing at the time (Tr. 376; see Tr. 372, 475). Following this last visit in July 1995, the record does not contain any further treatment notes from Dr. Blevins until October 6, 1997 (Tr. 371), more than a year after the expiration

---

[5]In a "clinical note" solicited as part of the development of this record and dated May 12, 2003, Dr. Blevins summarized his notes on plaintiff's progress, as follows:

> Patient was initially seen in my office on 5/30/95. I reviewed my medical records during the time frame as requested from 1995 through 1998. When I initially saw Ms. Griffin, she was suffering from dysfunctional uterine bleeding, persistent anemia, previous hx of HTN, peptic ulcer dx, and recurrent UTI. Subsequent testing showed that she had chronic iron deficiency anemia. EGD confirmed the evidence of reflux esophagitis. Subsequently, she did require treatment for recurring bronchitis, UTI, and did have an episode of chest pain and heart palpitations. She was subsequently seen by the cardiologist, and underwent cardiac catheterization. Fortunately, no significant coronary disease was found. She was treated for multiple health problems and in 7/98 she was still smoking cigarettes. Her meds included Tagamet 400 mg QID for GERD, Altace 5 mg QD for HTN, Trazadone 50 mg HS for depression, Lorazepam 1 mg TID for generalized anxiety disorder, and Premarin and Provera for hormone replacement tx.

(Tr. 475) It is entirely unclear how these appropriately treated medical conditions could result in the significant exertional, postural, and manipulative limitations -- as well as the necessary accommodations for severe pain -- recognized in the May 2003 functional assessment. Without the support of "relevant and objective evidence," the retrospective assessment of Dr. Blevins is not entitled to the significant weight otherwise due a treating physician's opinion. Strong, 88 Fed.Appx. at 845; see also Lancaster, 2009 WL 1851407, at *12 ("[A] retrospective diagnosis relating back to the insured period may be considered proof of disability only if it is corroborated by evidence contemporaneous with the eligible period."); cf. Wilson, 378 F.3d at 546 (noting that rejection of retrospective assessment of physician who treated claimant during insured period requires clarification of, *inter alia*, whether objective medical evidence and other substantial evidence supports the assessment).

15

of plaintiff's insured period.

This lack of any particular support for the limitations assessed by Dr. Blevins in August 1995 and May 2003, particularly when compared to the benign physical findings from his consultative examination of plaintiff, is sufficient reason for the rejection of those assessments. Without any other reliable assessment of plaintiff's full functional capacity during the relevant period, and giving plaintiff the benefit of the doubt, the ALJ adopted the May 2006 assessment of consultative examiner Dr. Surber that plaintiff retained the physical ability to perform essentially the full range of light work, as representative of her physical residual functional capacity prior to her date last insured. (Tr. 29, 651-58, 749-50) Although Dr. Surber examined plaintiff 10 years after her date last insured, his report indicates that the only medical records he reviewed prior to this examination were records from 1995 and 1996. (Tr. 651) The undersigned finds no error in the ALJ's rationale with respect to his weighting of the treating physicians' opinions. Substantial evidence supports the administrative decision in this case.[6]

## IV. Recommendation

---

[6] Although there would not appear to be any need to make any alternative findings in this case, it is perhaps noteworthy that the ALJ did obtain clarification from the vocational expert that the limitations assessed by Dr. Blevins on August 15, 1995 (Tr. 374-75) would not preclude work at the sedentary level, and that the number of representative jobs available in the national economy was nearly 200,000. (Tr. 747-48)

16

In light of the foregoing, the Magistrate Judge recommends that plaintiff's motion for judgment on the administrative record be DENIED, and that the decision of the SSA be AFFIRMED.

Any party has ten (10) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court. Any party opposing said objections shall have ten (10) days from receipt of any objections filed in which to file any responses to said objections. Failure to file specific objections within ten (10) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. Thomas v. Arn, 474 U.S. 140 (1985); Cowherd v. Million, 380 F.3d 909, 912 (6th Cir. 2004)(en banc).

**ENTERED** this 29th day of September, 2009.

    s/ John S. Bryant
JOHN S. BRYANT
UNITED STATES MAGISTRATE JUDGE